UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Mary C. Davis, Executrix of
the Estate of Kenneth Freeman,
    Plaintiff

    v.                              Civil No. 04-cv-273-SM
                                      Opinion No. 2007 DNH 077P
United States of America,
    Defendant

**O R D E R**

    The question presented by this case is how a decedent's state lottery winnings (in the form of 10 annual payments of approximately $209,000) should be valued for federal estate tax purposes.  The government argues that the right to ongoing lottery payments is properly valued by reference to the annuity tables set out in the Internal Revenue Code ("IRC"), yielding a taxable value, in this case, of $1,607,164.

    Plaintiff, on the other hand, argues that because the estate's right to receive future lottery payments is, by law, non-assignable, the asset is necessarily less valuable than it would be if it were freely transferable.  Accordingly, says plaintiff, reference to the annuity tables produces a distorted and over-stated value for tax purposes, thereby justifying use of an alternate valuation methodology.  Based on her expert's

appraisal, plaintiff asserts that the asset should be valued at
$803,582 for estate tax purposes (i.e., half the value yielded by
the tax valuation tables).

### Background

In 1989, plaintiff's decedent, Kenneth Freeman, won the
Massachusetts lottery and received the first of 20 annual
payments of $209,220 from the Commonwealth.  Slightly more than
nine years later (after receiving 10 annual payments from the
Commonwealth), Mr. Freeman died.  Upon his death, the remaining
10 annual payments became payable to Freeman's estate.  The
Commonwealth of Massachusetts has made the annual payments to the
estate.

At the time of his death, Mr. Freeman was a resident of
Somersworth, New Hampshire.  His federal estate tax return, filed
on February 1, 2000, reported a tax due of $520,012, a prior
payment of $530,624, and a refund due of $10,612.  On Schedule F
of the return, the estate disclosed the remaining 10 annual
payments due from the Commonwealth as an asset of the estate.
The estate valued that asset at $1,584,690, based upon the
annuity tables found in section 7520 of the IRC.  26 U.S.C. §
7520.

Subsequently, the Internal Revenue Service audited the estate's return and determined that the 10 remaining payments from the Commonwealth were properly valued slightly higher, at $1,607,164.  The reason for that discrepancy is not material – it resulted from a minor computational error by the estate.  Both parties agree that, if the court decides that the value of the annuity payments must be determined by reference to the annuity tables in the IRC, the correct value of the asset is $1,607,164.

As a result of the changes made by the IRS to the decedent's tax return (including revaluation of the lottery annuity), the estate's tax liability was actually reduced from $520,012 to $506,622.  Nevertheless, the executrix had second thoughts about how the lottery annuity had been valued (by both the estate itself and the IRS).  She determined that reference to the IRC annuity tables was not appropriate under the circumstances.  On December 28, 2001, the estate filed an informal claim for refund, asserting that the correct value of the remaining 10 annuity payments for estate tax purpose was $800,000 (roughly half the value ascribed to it by the IRC annuity tables).

The estate explained the difference by pointing out that the annuity tables fail to take into account the non–transferable

3

character of the right to receive future payments.  That is to say, the right to receive those payments cannot be sold, assigned, pledged as collateral, or otherwise transferred. Consequently, said the estate, the asset has a significantly lower fair market value than the tables establish.  The estate's informal claim for a tax refund was denied on November 21, 2002. Plaintiff then filed this timely suit seeking a tax refund.

The parties have stipulated that the 10 future payments owed by the Commonwealth to the decedent on the date of his death constitute an "annuity" within the meaning of sections 2039 and 7520(a) of the IRC and that the decedent's interest in those payments was an "ordinary annuity interest" within the meaning of the Estate Tax Regulation set forth in 26 C.F.R. § 20.7520–3(b)(1)(i)(A).  They also agree that, at the time of the decedent's death, the remaining 10 lottery payments due to him were neither marketable nor assignable.  Finally, as noted above, the parties agree that, if the court determines that the fair market value of the estate's annuity is properly determined by reference to the IRC annuity tables, it is correctly valued at $1,607,164.

By order dated December 19, 2005, the court denied the parties' cross-motions for summary judgment.  The court observed that, for estate tax purposes, the general rule requires that assets of the estate be valued at their fair market value and that the estate's annuity be valued by reference to the IRC annuity tables.  But, there is an exception to that rule.  Use of an alternate valuation method might be warranted if the plaintiff could prove that: (1) the value ascribed to the decedent's annuity by the IRC tables is "unrealistic and unreasonable," and (2) there is a more reasonable and realistic means by which to determine its fair market value.

The court then concluded that the nonmarketable right to receive 10 annual payments from the Massachusetts Lottery Commission is likely less valuable than it would be if that right were freely alienable.  In other words, the annuity's fair market value is, to some degree, less than its present value (as determined by the IRC tables), since those tables do not take into account the fact that the annuity is nonmarketable.[1]

---

[1]     An annuity's "present value" is the lump-sum amount that, if invested today, together with interest earnings (at an assumed rate of interest), would be enough to meet each of the payments as it fell due and, at the time of the last payment, the invested fund would be exactly zero.

Importantly, however, the court noted that there remained a genuinely disputed material fact: the correct tax value of the annuity if an alternate reliable valuation method is employed. Accordingly, it held that plaintiff failed to carry her burden of demonstrating that the value yielded by the IRC tables is "unrealistic and unreasonable."

> At this juncture, all the court can conclude is that the "present value" of the annuity (as determined by the IRC annuity tables) is likely to be higher than its "fair market value."  That conclusion might suggest that to properly value the annuity in this case reference to the IRC annuity tables is inappropriate. But, any discrepancy between the IRC tables and the "true" fair market value of the annuity in question does not necessarily compel the conclusion that it is improper to employ those tables.  Using a valuation method other than the annuity tables is only warranted if the difference between the value yielded by the IRC tables and the value determined by an alternate valuation method is sufficiently substantial to warrant the conclusion that the IRC annuity tables produce an "unreasonable and unrealistic" value.  Given the existence of a genuinely disputed material fact (i.e., the fair market value of the annuity if another, reliable valuation method is used), the court cannot determine the proper valuation method as a matter of law.

Davis v. United States, 2005 DNH 168 at 17–18 (D.N.H. Dec. 19, 2005)(emphasis in original).

In response, and in light of the fact that determining the proper method for valuing the annuity for tax purposes is

essentially a question of law, the parties have waived their requests for a jury trial and agreed to resolution of the case based upon submitted expert valuation reports in support of their respective positions.

The government asserts that, even using alternate valuation methods to determine the annuity's "fair market value," the results are so close to those yielded by the IRC tables that, as a matter of law, the stipulated value of $1,607,164, yielded by the tables, is the correct one for federal estate tax purposes. Plaintiff, on the other hand, asserts that the true "fair market value" of the annuity is only one-half of the amount suggested by the IRC tables.  Consequently, says plaintiff, the IRC tables yield an "unrealistic and unreasonable" approximation of the annuity's fair market value and the appropriate value the court should ascribe to the annuity is only $803,582.

## Discussion

In support of her position, plaintiff has submitted a valuation report prepared by Eugene A. Sommer (document no. 30-2).  That report is flawed.  In reaching his conclusion that the value of the annuity yielded by the IRC tables should be

discounted by fifty percent (50%) to account for its lack of marketability, Mr. Sommer relies upon a mistaken assumption.

The IRC imposes a tax on "the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." 26 U.S.C. § 2001(a). For tax purposes, a decedent's estate includes "the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." 26 U.S.C. § 2031(a). The pertinent tax regulations make clear that all assets included in the decedent's estate are valued at their "fair market value," which is defined to mean "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 20.2031-1(b).

The "property" at issue is, of course, the estate's enforceable and virtually risk-free (albeit non-assignable) right to receive 10 annual payments of approximately $209,000 from the Commonwealth. Consequently, the question presented in this case is this: How much would a willing and fully informed hypothetical buyer pay for a legally enforceable, virtually risk-free, right

8

to receive 10 annual payments of roughly $209,000 that cannot be
assigned to a third party?

In his report, Mr. Sommer did not attempt to assess how much
the hypothetical, fully-informed buyer would be willing to pay
for such an asset.  Instead, he attempted to calculate the amount
for which the estate could <u>sell</u> the annuity (if it so chose) to a
fully-informed, willing, hypothetical buyer.  Critically,
however, such a buyer would be acquiring <u>less</u> than what the
estate has.  Because the annuity is non-assignable and non-
transferable, the hypothetical buyer in Mr. Sommer's calculations
would "recogniz[e] that the intangible asset will be paid by the
[Commonwealth] only to the winner of the lottery and not to a
third party."  Sommer Report at 2, para. 2.1.  Thus, one of Mr.
Sommer's fundamental assumptions is that the hypothetical
purchaser of the annuity would discount its value substantially,
not simply because he or she would have difficulty selling it to
another party, but also because "the income stream by a potential
buyer is at risk."  <u>Id</u>.

Plainly, however, the income stream is not at risk due to
potential insolvency of the Commonwealth.  So, the risk that Mr.
Sommer assumed exists must originate elsewhere.  Given that, it

seems that Mr. Sommer envisioned a situation in which the estate would "sell" the (non-assignable) annuity to a third party, who would depend on the estate to continue receiving payments from the Commonwealth and then remit those payments to the third party.  In light of those assumptions, Mr. Sommer concludes that:

> Therefore the hypothetical buyer of a Massachusetts Megabucks lottery prize lacks the ability to perfect a security interest; would be unable to collect if the seller became mentally incompetent or died; and would also suffer from lack of marketability, as there would be no public market for the future cash flow stream.

Sommer Report at 3, para. 3.1.  As the United States District Court for the District of Massachusetts has observed, "[t]hose risks would be relevant here if the issue were valuation of the estate of a <u>buyer</u> of lottery winnings."  <u>Estate of Donovan v. United States</u>, 2005 WL 958403 at *5 (D.Ma. April 26, 2005) (emphasis in original).  That, however, is not the issue before the court.

For purposes of determining the fair market value of the estate's annuity, the assumptions underlying Mr. Sommer's report are incorrect.  The question here is not how much a hypothetical buyer would pay the estate for its "used" lottery ticket. Instead, the question is how much that hypothetical buyer would pay to stand in the shoes of the estate.  The government's

10

expert, Professor Jarrell, correctly made this observation in his
report, noting:

> Mr. Sommer's opinion that a 50% discount for lack of
> marketability is applicable, is based on the incorrect
> assumption that the hypothetical buyer could not gain
> legal rights to the ten-payments annuity even if they
> were the highest bidder in the auction.  The correct
> hypothetical question is to determine the price that a
> hypothetical bidder would pay assuming that the
> hypothetical buyer could gain full legal rights to the
> ten-payments annuity but could not resell those rights.

Report of Gregg A. Jarrell, Ph.D. (document no. 30-4) at 2-3.
That is, the question before the court is the fair market value
of an annuity that would provide its owner with all the rights
the estate currently has - including, of course, the legally
enforceable right to compel the Commonwealth to make the annual
payments, independent of the life or mental status of any
individual.  See, e.g., Guggenheim v. Rasquin, 312 U.S. 254
(1941) (holding that for gift tax purposes, the value of a life
insurance policy is the cost to purchase that (or a similar)
policy, rather than its cash surrender value).

Given Mr. Sommer's assumptions, it is not surprising that he
concludes that a hypothetical buyer of an enormously risky
investment would purchase it only at a sizeable discount.  But,
because the court concludes that the assumptions underlying Mr.

Sommer's conclusions are faulty, it cannot credit his conclusion that the fair market value of the annuity in question is only fifty percent (50%) of its present value (i.e., $ 803,582).

The government's experts, on the other hand, persuasively reason that a hypothetical purchaser of a virtually risk-free, but non-assignable, right to receive 10 annual payments from the Commonwealth would be willing to pay something very close to the present value of those 10 payments.  In fact, one of the government's experts – Mr. Goldsholle – credibly argues that the hypothetical buyer might even be willing to pay slightly <u>more</u> than the value yielded by the IRC tables, given the fact that the income stream the annuity generates is as close to a risk-free investment as one might imagine.  <u>See</u> Valuation Report by Gerry H. Goldsholle (document no. 30-3) at 16 (observing that financially stable insurance companies selling 10-year immediate annuity certain contracts paying $209,000 annually for ten years charge more for such annuities than the figure yielded by the IRC tables).

In his report, Mr. Goldsholle credibly concludes, among other things, that:

12

1.  The estate's right to receive ten annual
    payments of approximately $209,000 from the
    Commonwealth is substantially similar to a
    non-commutable, 10-year, immediate annuity
    certain contract;

2.  Given that, a reasonable and accurate
    approximation of the fair market value of the
    estate's annuity is the amount that an
    insurance company would charge for a similar
    annuity (or, viewed from a slightly different
    perspective, the amount a fully informed
    buyer would pay for such an annuity in the
    retail market);

3.  There is no established secondary market in
    which holders of either winning lottery
    tickets or commercially-issued annuities
    might sell those assets;

4.  Despite the lack of an established secondary
    market in which holders of annuities might
    sell those assets, the lack of liquidity does
    not appear to affect the price at which
    insurance companies sell those annuities or
    the price that annuity buyers are willing to
    pay;

5.  Given that there is virtually no risk that
    the Commonwealth will default on its
    obligations under the annuity held by the
    estate, the hypothetical fully-informed buyer
    would be willing to pay at least as much (if
    not more) for that asset as the amount that
    insurance companies charge for similar
    annuities;

6.  The IRC tables provide an accurate estimation
    of the fair market value of an annuity,
    taking into consideration the many variables
    that would affect an individual annuity's
    value (e.g., financial strength of the
    issuing company, risk of default, etc.) and,
    if anything, those tables may actually under-
    estimate the fair market value the estate's
    annuity.

13

<u>Id</u>. at 7–16.

       Given the record before it, the court concludes that the
non-assignable nature of the estate's annuity has a minimal (if
any) effect on its fair market value.  At the very most, its lack
of assignability would result in a five percent (5%) discount
relative to comparable, but freely transferable, annuities.  <u>See</u>
Report of Gregg Jarrell at 5; Report of Gerry Goldsholle at 15–
16.  In light of the virtually non-existent risk of default by
the Commonwealth, however, it is entirely possible that the
estate's annuity actually has a fair market value slightly in
excess of the value ascribed to it by the IRC tables.

       Assuming that the true fair market value of the estate's
annuity is five percent (5%) less than the amount yielded by the
IRC table, the next question presented is whether that difference
is sufficiently substantial to render the IRC figure "unrealistic
and unreasonable."  It is not.  <u>See, e.g.</u>, <u>Anthony v. United
States</u>, 2005 WL 1670697 (M.D. La. June 17, 2005) (holding that
the value yielded by the IRC tables was not unrealistic or
unreasonable, despite plaintiff's evidence that the fair market
value of the annuities in question was thirty-two percent lower).

14

See generally Cook v. Comm'r of the IRS, 349 F.3d 850, 854 (5th Cir. 2003) ("In enacting § 7520(a)(1) and requiring valuation by the tables, Congress displayed a preference for convenience and certainty over accuracy in the individual case.").

The court has not found (nor has plaintiff cited) any cases in which such a minor deviation from the figure yielded by the IRC tables warranted a departure from those tables. See generally Cook, 349 F.3d at 855 (collecting cases in which the courts concluded that a departure from the IRC tables was justified due to faulty assumptions made by the tables, which resulted in substantially overstating the fair market value of the asset in question). Even the two circuit courts of appeals that have concluded that lottery annuities should not be valued by reference to the IRC tables did so only after finding that the IRC tables yielded a value that deviated from the annuities' "true" fair market value by more than twenty five percent (25%).

In Shackleford v. United States, 262 F.3d 1028 (9th Cir. 2001), the court of appeals affirmed the district court's conclusion that the IRC tables underestimated the fair market value of a non-assignable lottery annuity by fifty percent (50%). Importantly, however, neither the district court nor the court of

15

appeals explained why the lack of marketability, alone, reduced the annuity's fair market value so substantially (other than to observe that the right of alienability is an essential property right). In this case, the government's experts have plausibly and credibly reasoned that purchasers of annuities are, generally speaking, interested in acquiring a stable and steady income stream; they are not generally concerned with liquidity. Accordingly, the fair market value of an annuity is not, generally speaking, adversely affected in any substantial way by its lack of marketability. Given the evidence of record in this case, the court is not persuaded by the reasoning in Shackleford.

In Estate of Gribauskas v. Comm'r of Internal Revenue, 342 F.3d 85 (2d Cir. 2003), the Commissioner actually agreed that "the estate's valuation of the [lottery annuity], a figure over $900,000 below that prescribed by the § 7520 standardized valuation tables, accurately reflects the market discount attributable to those restrictions." Id. at 88. Given that concession by the government – that is, that the IRC tables over-valued the annuity by roughly thirty percent (30%) – the court understandably concluded that, in that particular case, deviation from the IRC tables was appropriate. In this case, however, there is no such stipulation. And, beyond that, the government

16

has introduced two expert reports that credibly conclude that the fair market value of the estate's annuity is <u>not</u> substantially reduced by virtue of its lack of marketability.

## Conclusion

Unlike either <u>Shackleford</u> or <u>Gribauskas</u>, the record in this case simply does not permit the court to conclude that the IRC tables substantially overvalue the estate's annuity. At most, the court could plausibly conclude that there is a five percent (5%) difference between the "true" fair market value of the estate's annuity and the value yielded by the IRC tables. That discrepancy, however, is insufficient to warrant a departure from those tables. Even if the IRC tables are, in this particular case, off by as much as five percent (5%), plaintiff has failed to demonstrate that such a relatively minor discrepancy is sufficient to warrant the conclusion that the value those tables ascribe to the decedent's annuity is "unrealistic and unreasonable."

On the record before it, the court concludes that plaintiff has failed to carry her burden of demonstrating that the estate's annuity should be valued by some method other than reference to the IRC tables. Accordingly, for federal estate tax purposes,

17

the court concludes that the proper value for the estate's annuity is the stipulated figure of $1,607,164, prescribed by the IRC tables.

The Clerk of Court shall enter judgment in favor of defendant and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

June 13, 2007

cc:  Peter S. Black, Esq.
     Valerie Wright, Esq.
     William C. Knowles, Esq.
     Stephen T. Lyons, Esq.

18